**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK GASTINEAU

    Plaintiff,

    v.

ESPN INC., ESPN FILMS, NFL PRODUCTIONS, LLC D/B/A NFL FILMS, NATIONAL FOOTBALL LEAGUE, JAMES WEINER, AND KEN RODGERS,

    Defendants.

Civil Action No. 1:25-CV-02041-PAE

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iv

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 3

   A.  Defendants ........................................................................................................ 3

   B.  The Talent Agreement ...................................................................................... 3

   C.  The Favre Encounter ........................................................................................ 4

LEGAL STANDARD ......................................................................................................... 5

ARGUMENT ...................................................................................................................... 7

I.   GASTINEAU'S BREACH OF CONTRACT CLAIM CONTRADICTS THE
TERMS OF THE CONTRACT AND MUST BE DISMISSED ........................................... 7

   A.  Gastineau Waived Any Right to Approve Use of the Favre Encounter Footage
in the Film ........................................................................................................ 8

   B.  NFL Films Did Not Breach Paragraph 9 of the Talent Agreement ................... 11

   C.  NFL Films Did Not Breach Paragraph 16 of the Talent Agreement ................. 12

   D.  Gastineau Fails to Allege Material Breach or Damages Caused by NFL Films'
Alleged Breach of Paragraph 15 of the Talent Agreement ................................ 13

II.   GASTINEAU FAILS TO STATE A CLAIM UNDER N.Y. CIV. R. L. §§ 50
AND 51 ........................................................................................................................... 14

   A.  Gastineau Granted the Very Rights of Publicity He Seeks to Enforce .............. 14

   B.  Newsworthy Publications Are Exempt from N.Y. Civ. R. L. §§ 50 and 51 ....... 15

   C.  Gastineau Had No Expectation of Privacy in the Favre Encounter ................... 16

III.  GASTINEAU FAILS TO STATE A LANHAM ACT OR COMMON LAW
UNFAIR COMPETITION CLAIM ..................................................................................... 16

   A.  Gastineau's Lanham Act Claim Fails Because He Licensed His Right of
Publicity to Defendants and Cannot Allege Consumer Confusion ..................... 17

   B.  Gastineau's Unfair Competition Claim Fails for the Same Reasons ................. 18

   C.  The First Amendment Exempts Defendants from the Lanham Act Claim ......... 19

IV.  THE COPYRIGHT ACT PREEMPTS GASTINEUA'S PUBLICITY AND
UNFAIR COMPETITION CLAIMS ................................................................................... 20

V.   ALL CLAIMS MUST BE DISMISSED AGAINST WEINER AND RODGERS ............. 22

   A.  Gastineau Failed to Timely Serve Weiner and Rodgers .................................. 22

   B.  Gastineau Fails to Allege Facts Supporting Personal Jurisdiction ................... 23

     1.  Gastineau Fails to Allege Facts Supporting General Jurisdiction ............... 23

      2.    Gastineau Fails to Allege Facts Supporting Specific Jurisdiction ................................ 24

  C.    The Amended Complaint Lacks Any Specific Allegations Against Weiner and Rodgers. ................................................................................................................. 25

CONCLUSION ................................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................. 5

*Atuahene v. City of Hartford,*
    10 F. App'x 33 (2d Cir. 2001) ...................................................................... 7, 25

*Bell Atlantic v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................. 5

*Betty, Inc. v. PepsiCo, Inc.,*
    283 F. Supp. 3d 154 (S.D.N.Y. 2017) .............................................................. 21

*Briarpatch Ltd. L.P v. Phoenix Pictures, Inc.,*
    373 F.3d 296 (2d Cir. 2004) .............................................................................. 21

*Brinkmann v. Adrian Carriers, Inc.,*
    29 A.D.3d 615 (2d Dep't 2006) ........................................................................ 24

*Brown v. Showtime Networks, Inc.,*
    394 F. Supp. 3d 418 (S.D.N.Y. 2019) ................................................... 6, 19, 20

*Camelot SI, LLC v. ThreeSixty Brands Grp. LLC,*
    632 F. Supp. 3d 471 (S.D.N.Y. 2022) ........................................................ 17, 18

*Cartiga, LLC v. Aquino,*
    2025 WL 388804 (S.D.N.Y. Feb. 4, 2025) ...................................................... 24

*Champlin v. Music Sales Corp.,*
    604 F. Supp. 3d 224 (S.D.N.Y. 2022) ................................................................ 6

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014) ........................................................................................... 24

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,*
    631 F.3d 42 (2d Cir. 2011) ................................................................................ 14

*Diesel S.p.A. v. Diesel Power Gear, LLC,*
    2022 WL 956223 (S.D.N.Y. Mar. 30, 2022) ................................................... 18

*DiFolco v. MSNBC Cable L.L.C.,*
    622 F.3d 104 (2d Cir. 2010) ................................................................................ 6

*Dryer v. Nat'l Football League,*
    814 F.3d 938 (8th Cir. 2016) ....................................................................... 18, 22

*Edme v. Internet Brands, Inc.*,
   968 F. Supp. 2d 519 (E.D.N.Y. 2013) ............................................................... 15

*Fischer v. Forrest*,
   286 F. Supp. 3d 590 (S.D.N.Y. 2018) ............................................................... 18

*Gautier v. Pro-Football, Inc.*,
   304 N.Y. 354 (1952) ......................................................................................... 16

*George v. Pro. Disposables Int'l, Inc.*,
   221 F. Supp. 3d 428 (S.D.N.Y. 2016) ............................................................... 22

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
   425 F.3d 158 (2d Cir. 2005) ................................................................................ 7

*Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
   530 F. Supp. 3d 447 (S.D.N.Y. 2021) ................................................................. 7

*Jazini v. Nissan Motor Co.*,
   148 F.3d 181 (2d Cir. 1998) ................................................................................ 7

*Joseph Burstyn, Inc. v. Wilson*,
   343 U.S. 495 (1952) ......................................................................................... 19

*Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*,
   694 F. Supp. 3d 374 (S.D.N.Y. 2023) ...................................................... 6, 23, 24

*Kelly Toys Holdings, LLC. v. Top Dep't Store*,
   2022 WL 3701216 (S.D.N.Y. Aug. 26, 2022) ..................................................... 7

*Kitchen Winners NY Inc. v. Rock Fintek LLC*,
   2024 WL 3676931 (S.D.N.Y. Aug. 6, 2024) ..................................................... 13

*Kogan v. Facebook, Inc.*,
   334 F.R.D. 393 (S.D.N.Y. 2020) ..................................................................... 22

*L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010) .............................................................................. 10

*Lamparello v. Falwell*,
   420 F.3d 309 (4th Cir. 2005) ........................................................................... 20

*Lerman v. Flynt Distrib. Co.*,
   745 F.2d 123 (2d Cir. 1984) .............................................................................. 16

*Locus Techs. v. Honeywell Int'l Inc.*,
   632 F. Supp. 3d 341 (S.D.N.Y. 2022) ................................................................. 8

*Lopez v. Nike, Inc.*,
  2021 WL 128574 (S.D.N.Y. Jan. 14, 2021) ............................................................ 17

*Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*,
  868 F. Supp. 2d 172 (S.D.N.Y. 2012) ............................................................ 19, 20

*Medina v. Bauer*,
  2004 WL 136636 (S.D.N.Y. Jan. 27, 2004) ............................................................ 25

*Melendez v. Sirius XM Radio, In*c.,
  50 F.4th 294 (2d Cir. 2022) ............................................................ 21

*Messenger ex rel. Messenger v. Gruner + Jahr Printing & Pub.*,
  94 N.Y.2d 436 (2000) ............................................................ 15

*Nat'l Market Share v. Sterling Nat'l Bank*,
  392 F.3d 520 (2d Cir. 2004) ............................................................ 14

*Oma v. Hillman Periodicals, Inc.*,
  281 A.D. 240 (1st Dep't. 1953) ............................................................ 15

*Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*,
  830 F.3d 152 (2d Cir. 2016) ............................................................ 8

*Owens v. Gaffken & Barriger Fund, LLC*,
  2009 WL 3073338 (S.D.N.Y. Sept. 21, 2009) ............................................................ 13

*Perreca v. Gluck*,
  295 F.3d 215 (2d Cir. 2002) ............................................................ 10

*Reed v. Luxury Vacation Home LLC*,
  632 F. Supp. 3d 489 (S.D.N.Y. 2022) ............................................................ 23

*Rogers v. Grimaldi*,
  745 F.2d 123875 F.2d 994 (2d Cir. 1989) ............................................................ 19

*SCE Grp. Inc. v. City of New York*,
  2020 WL 1033592 (S.D.N.Y. Mar. 3, 2020) ............................................................ 7, 25

*Septembertide Pub., B.V. v. Stein & Day, Inc.*,
  884 F.2d 675 (2d Cir. 1989) ............................................................ 13

*Shorts v. Cedars Bus. Servs., LLC*,
  2025 WL 580208 (S.D.N.Y. Feb. 21, 2025) ............................................................ 23

*Songhorian v. Lee*,
  2012 WL 6043283 (S.D.N.Y. Dec. 3, 2012) ............................................................ 22

*Stephano v. News Grp. Publications, Inc.*,
    64 N.Y.2d 174 (1984) ............................................................................................ 15

*Stroud v. Tyson Foods, Inc.*,
    91 F. Supp. 3d 381 (E.D.N.Y. 2015) ..................................................................... 23

*Sure-Trip, Inc. v. Westinghouse Eng'g*,
    47 F.3d 526 (2d Cir. 1995) ..................................................................................... 10

*Titan Sports, Inc. v. Comics World Corp.*,
    870 F.2d 85 (2d Cir. 1989) ..................................................................................... 15

*Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*,
    996 F.2d 1366 (2d Cir. 1993) ................................................................................. 20

*United States ex rel. Foreman v. AECOM*,
    19 F.4th 85, 106 (2d Cir. 2021) ................................................................................ 6

*Urbont v. Sony Music Ent.*,
    831 F.3d 80 (2d Cir. 2016) ..................................................................................... 20

*Waheed v. Sands*,
    2024 WL 1719363 (S.D.N.Y. Apr. 22, 2024) ....................................................... 23

*Wallace Church & Co. Inc. v. Wyattzier, LLC*,
    2020 WL 4369850 (S.D.N.Y. July 30, 2020) ....................................................... 23

**Statutes**

15 U.S.C. § 1125(a) ...................................................................................................... 17

17 U.S.C. § 102(a)(6) .................................................................................................... 21

17 U.S.C. § 106(1), (3), (4) ........................................................................................... 21

17 U.S.C. § 301(a) ........................................................................................................ 20

N.Y. Civ. R. L. , 14, 15

N.Y. Civ. R. L. § 51 ............................................................................................. , 14, 15

**Rules**

C.P.L.R. § 302 .................................................................................................... 23, 24

Fed. R. Civ. P. 12(b)(5) ...................................................................................... 1, , 22

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 1, 5

Fed. R. Civ. P. 4(m) ................................................................................................................. 22

Fed. R. Civ. P. 8 ................................................................................................................. 7, 25

The National Football League ("NFL"), NFL Productions LLC D/B/A NFL Films ("NFL Films," and collectively with the NFL, the "NFL Defendants"), ESPN, Inc., ESPN Films (together, "ESPN"), James Weiner and Ken Rodgers ("Weiner and Rodgers," and collectively with the NFL Defendants and ESPN, "Defendants"), submit this Memorandum of Law in Support of their Motion to Dismiss Plaintiff's Amended Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) as to all Defendants, and for lack of personal jurisdiction under Rule 12(b)(2), untimely service of process under Rule 12(b)(5), and failure to satisfy Rule 8 as to Weiner and Rodgers.

## <u>INTRODUCTION</u>

ESPN Films is the distributor of *30 for 30*, a series of documentary films highlighting significant figures and events in sports history. ESPN partnered with NFL Films to produce "30 for 30: The New York Sack Exchange" (the "Film" or the "Project"), focusing on plaintiff Mark Gastineau ("Gastineau") and his teammates on the New York Jets' defensive line in the early 1980s. In connection with his participation in the Project, Gastineau executed two documents: the first was NFL Films' "Guest/Performer Release" that covered appearances for which he was not compensated. Gastineau subsequently signed a "Talent Agreement" with NFL Films with respect to two specifically-identified performances for which he was compensated. In the Talent Agreement, Gastineau granted NFL Films the right to his name, image, voice, and likeness in connection with the Project and waived any right to approve the manner of his identity and portrayal in the Film, or to approve the finished Film itself (as he also did in the Guest/Performer Release).

After the Film's release, Gastineau purportedly became unhappy with the Film, and with this action now seeks to penalize Defendants for using footage in which he voluntarily appeared and which depicts newsworthy and compelling events. In his Amended Complaint ("FAC" or "Amended Complaint"), ECF 20, Gastineau asserts four claims against Defendants—breach of

contract, violation of N.Y. Civ. R. L. §§ 50 and 51, false endorsement under the Lanham Act, and common law unfair competition—and seeks upwards of *$100,000,000* in alleged damages.

Each of Gastineau's claims arises from the publication of an encounter between Gastineau and former NFL quarterback Brett Favre during the 2023 Chicago Sports Spectacular (the "Favre Encounter"). Surrounded by a group of onlookers in a Chicago convention hall and the Project's camera crew, Gastineau accused Favre of "[falling] down for [Michael Strahan]" and threatened that he would "get [his] sack back." Gastineau was referring to the final minutes of the 2001 NFL regular season, during which New York Giant defensive end Michael Strahan famously sacked Favre and broke the NFL record for most sacks in a single season. Until that moment, Gastineau held that record and so NFL Films included this dramatic on-field moment in the Film, as well as discussion by the Film's protagonists about it, including the Favre Encounter.

In contravention of Defendants' contractual and First Amendment rights, Gastineau now contends that Defendants did not have permission to film the Favre Encounter (notwithstanding the film crew with which he was engaging) and that Defendants' omission of a few seconds at the commencement of the Encounter, during which the two allegedly shook hands, placed Gastineau in a bad light and somehow changed the tenor and tone of what transpired after that handshake.

Because Gastineau granted unfettered rights of publicity, including with respect to the footage about which he is complaining, and waived any right of approval of the Film in its totality, his claims all fail. Even viewing the Amended Complaint in the light most favorable to him, Gastineau has failed to plead sufficient facts to support any claim resulting from the inclusion of actual footage in a documentary to which he granted his consent. Despite taking the opportunity to amend his complaint, the updated allegations in the Amended Complaint do nothing to redeem Gastineau's woefully deficient pleadings. Accordingly, the Court should grant Defendants' motion

to dismiss the Amended Complaint in its entirety with prejudice and without leave to amend.

## FACTUAL BACKGROUND[1]

### A.    Defendants

Defendant NFL Films is the film and television production company for defendant NFL, the nation's premier professional American football league and an unincorporated association of 32 member clubs. FAC ¶¶ 21–22, 24.

Together with NFL Films, defendant ESPN Films—a film and production company co-owned by leading sports media corporation and defendant ESPN, Inc.—produced and published the Film at the heart of this dispute: "30 for 30: The New York Sack Exchange." *Id.* ¶¶ 21, 25–27.

Defendants James Weiner and Ken Rodgers are employees of NFL Films and co-directed the Film. *Id.* ¶¶ 28–29. Gastineau served Weiner and Rodgers with the initial complaint on June 12, 2025 and June 13, 2025, respectively. *See* ECF 24, 25.

The Film was released as part of ESPN Films' *30 for 30* series of sports documentary films and partially featured the plaintiff, Mark Gastineau. FAC ¶¶ 1–2. Gastineau, a resident of New Jersey, describes himself as a "highly successful former American former [sic] professional defensive end" and a "highly recognized celebrity" in both the entertainment and philanthropic worlds. *Id.* ¶¶ 20, 36–38. He also held the NFL single-season sack record at the time of his retirement. *Id.* ¶ 20.

### B.    The Talent Agreement

On or about August 8, 2023, months before the Favre Encounter, Gastineau signed a "Guest/Performer Release" (the "General Release") for his general and uncompensated

---

[1] Defendants assume the truth of Gastineau's allegations in the Amended Complaint for purposes of this Motion only.

appearances in the Film.[2] *See id.* ¶ 65. Subsequently, as Gastineau acknowledges in his Amended Complaint, on or about January 25, 2024, NFL Films entered into a Talent Agreement with Gastineau (the "Talent Agreement" or "TA").[3] *Id.* ¶¶ 9, 42. The Talent Agreement defines the "Project" as "the program titled '30 for 30: The New York Sack Exchange.'" *Id.* ¶ 43; TA at 1. The Talent Agreement further provides that in exchange for compensation, "Talent will render non-exclusive on-camera appearance services" for the Project. TA at 1. "The Services shall include" a sit-down interview (the "Interview") and a filming session at the New York Stock Exchange (the "NYSE Shoot") for potential use in the Film. *Id.* Under the Talent Agreement, Gastineau also granted his rights of publicity (the "Licensed Identity") in connection with the Film and any promotion of it:

> In consideration of the Compensation, and without any further consideration from NFL Films, Talent [Gastineau] grants the NFL Parties (as defined below) the unlimited right throughout the world to use Talent's name, voice, portrayal, performance, appearance, actions, likeness, and/or biographical information ("<u>Licensed Identity</u>") in connection with the Project and any promotion thereof, in any and all media whether now known or hereafter created.

*Id.* ¶ 2. Gastineau further agreed that he "waives any right that [he] may have to inspect or approve the duration or manner of Talent's Licensed Identity in the Project, the finished Project and any distribution of the Project." *Id.* ¶ 8.

### C.    The Favre Encounter

During the Film's production, Gastineau confronted Brett Favre at the 2023 Chicago Sports Spectacular and accused Favre of giving a sack to Michael Strahan, which allowed Strahan to break Gastineau's single season sack record. FAC ¶¶ 3, 5. Film production crew members captured

---

[2] A true and correct copy of the General Release is attached to the Declaration of Timothy Chung filed in support of Defendants' motion to dismiss Plaintiff's Complaint ("Chung Decl.") as Exhibit B, ECF 18-2. Defendants do not rely on the legal import of the General Release in the present Motion and only note its existence for context.
[3] A true and correct copy of the Talent Agreement is attached as Exhibit C to the Chung Decl., ECF 18-3.

this encounter with Gastineau's cooperation and subsequently published it in a short trailer for the

Film (the "Trailer"), Chung Decl., ¶ 7, ECF 18, and included it in the Film's final cut.[4] FAC ¶ 12.

Nearly four months after the public release of the Trailer, Gastineau filed this litigation. *Id.*

¶¶ 12–13. Despite having agreed to the terms of the Talent Agreement, *id.* ¶¶ 9, 42, and before that

the General Release, Gastineau alleges Defendants "never approached" him nor sought to "license

or use [Gastineau's] name, picture or image for any purpose, including commercial advertising,

sponsorship or endorsement from the [Favre Encounter]," *id.* ¶ 41. Gastineau also alleges

Defendants "intentionally and maliciously did not publish Mark Gastineau and Brett Favre shaking

hands at the commencement of the [Favre Encounter]." *Id.* ¶ 15. Based on these allegations,

Gastineau asserts four separate claims against Defendants and seeks a minimum of $100 million

in damages as well as injunctive relief. *Id.* at 28 (a)-(e).

## **LEGAL STANDARD**

To survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6),

Gastineau must plead "enough facts to state a claim to relief that is plausible on its face." *Bell*

*Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). For his claims to be facially plausible, Gastineau

was required to plead "factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

For this purpose, the Court cannot accept as true "[t]hreadbare recitals of the elements of a cause

of action, supported by mere conclusory statements." *Id.* The Court may credit "well-pleaded,

nonconclusory factual allegations" but not "legal conclusions" or "naked assertions devoid of

further factual enhancement." *Id.* at 678–80 (internal citations omitted).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a

---

[4] A true and correct copy of the Film is attached as Exhibit D to the Chung Decl., ECF 18-4.

district court may consider . . . documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *Champlin v. Music Sales Corp.*, 604 F. Supp. 3d 224, 232 (S.D.N.Y. 2022) (Engelmayer, J.) (quoting *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021)). Further, "[w]here a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint . . . [and] no dispute exists regarding the authenticity or accuracy of the document' and . . . 'there exist no material disputed issues of fact regarding the relevance of the document.'" *AECOM*, 19 F.4th at 106 (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

Thus, on this Motion, the Court can consider both the Talent Agreement and the footage of the Favre Encounter. Gastineau extensively cites to the Talent Agreement in the Amended Complaint and bases his breach of contract claim on its terms. *See* FAC ¶¶ 9–11, 33–34, 42–68, 106–110. Gastineau likewise repeatedly refers to and relies on the Favre Encounter in the Amended Complaint. *See*, *e.g.*, *id*. ¶¶ 12–15, 22–27. Indeed, the video recording of the Favre Encounter, and its use in the Film and in the Trailer, forms the basis of Gastineau's claims. Accordingly, the Court can consider and rely on the video recording of the Favre Encounter and the full Film in deciding this motion. *Brown v. Showtime Networks, Inc.*, 394 F. Supp. 3d 418, 436 (S.D.N.Y. 2019) ("The Court may consider the documentary film [] attached by exhibit to Defendants' Declaration, since the film is integral to the Complaint.").

On a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), "[Gastineau] bears the burden of establishing that the [C]ourt has jurisdiction over the [D]efendant[s]." *Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*, 694 F. Supp. 3d 374, 383 (S.D.N.Y. 2023) (quoting *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d

Cir. 2005)). However, the allegations "'must be more than 'conclusory statement[s]' and must state specific 'facts supporting th[e] conclusion' that jurisdiction is proper." *Id.* (quoting *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998)). Similarly, on a motion to dismiss for insufficient service of process under Fed. R. Civ. P. 12(b)(5), "the burden of proof is on the plaintiff to show the adequacy of service" and the Court must look beyond the complaint in considering the motion. *Kelly Toys Holdings, LLC. v. Top Dep't Store*, 2022 WL 3701216, at *5 (S.D.N.Y. Aug. 26, 2022) (Engelmayer, J.) (internal citation omitted).

Gastineau's complaint must also comply with Fed. R. Civ. P. 8. To meet the minimum standards of Rule 8, the complaint must "give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *SCE Grp. Inc. v. City of New York*, 2020 WL 1033592, at *3 (S.D.N.Y. Mar. 3, 2020) (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order)). The Amended Complaint does not meet any of these standards.

## **ARGUMENT**

### I.    **Gastineau's Breach of Contract Claim Contradicts the Terms of the Contract and Must Be Dismissed**

Gastineau's contract claims must be dismissed because the plain and unambiguous language of the Talent Agreement's terms contradicts each of the interpretations Gastineau advances to argue Defendants breached multiple provisions of that agreement.[5] FAC ¶¶ 49–66. *See Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 530 F. Supp. 3d 447, 454 (S.D.N.Y. 2021)  ("[T]he Court may dismiss a breach of contract claim for failure to state a claim if the 'plain language' of the contract contradicts or fails to support the plaintiff's allegations

---

[5] Gastineau improperly asserts his breach of contract claims against Defendants NFL, ESPN, and Weiner and Rodgers, none of whom were signatories or parties to the Talent Agreement. The only signatories to the Talent Agreement are NFL Films and Mark Gastineau. *See* TA at 4. Gastineau's breach of contract claims against defendants NFL, ESPN, and Weiner and Rodgers therefore must be dismissed.

of breach.") (citation omitted). Dismissal of Gastineau's contract claim is also appropriate because Defendants' interpretation of those provisions "is the only reasonable interpretation." *Locus Techs. v. Honeywell Int'l Inc.*, 632 F. Supp. 3d 341, 369 (S.D.N.Y. 2022). The language in the Talent Agreement "has a definite and precise meaning," and accordingly, there is no "reasonable basis for a difference of opinion." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156–158 (2d Cir. 2016) (citation omitted).

### A.   Gastineau Waived Any Right to Approve Use of the Favre Encounter Footage in the Film

Gastineau alleges NFL Films breached the Talent Agreement when it failed to secure his approval to include the Favre Encounter in the Film. FAC ¶¶ 49–51. But no such breach occurred because Gastineau never had any such approval right. In Paragraph 8 of the Talent Agreement, Gastineau unequivocally waived all rights of approval to any uses of his "Licensed Identity," *i.e.,* his "name, voice, portrayal, performance, appearance, actions, likeness, and/or biographical information," TA ¶ 2, and to the finished Film itself:

> Talent waives any right that they may have to inspect or approve the ***duration or manner of*** Talent's ***Licensed Identity in the Project***, ***the finished Project*** and ***any distribution of the Project***.

TA ¶ 8 (emphases added).[6] Paragraph 8 is a broad waiver that covers all uses of Gastineau's likeness in connection with the Film. Therefore, Gastineau's waiver of his approval rights in Paragraph 8 necessarily includes the use of the Favre Encounter in the Film.

Knowing that, in Paragraph 8, he waived the right to approve the manner of the depiction of his identity in the Project, as well as the right to approve "the finished Project" itself, Gastineau argues that Paragraph 5 gives him the right to veto the inclusion of the Favre Encounter in the Project. FAC ¶¶ 50–51. But Gastineau misreads the rights provided in Paragraph 5 and conflates

---

[6] Gastineau entirely ignores the plain language of Paragraphs 8 and 2 to make his claims.

Gastineau's "performance" of his services under the Talent Agreement with his appearance in the Film as a whole. Paragraph 5 reads:

> NFL Films shall have the right to make or have made any number of modifications to the Project by editing, modifying, varying, dubbing, adding to, subtracting from and integrating any or all of Talent's performance hereunder, provided that Talent will not have to render any services in connection with the production of such modifications and all modified use of the [performance][7] must be approved by Talent. For the avoidance of doubt, NFL Films shall have no obligation to pay Talent for modifications to the Project (or to Talent's performance therein).

TA ¶ 5.

Paragraph 5 provides that NFL Films, ***not*** Gastineau, has the right to modify the Project by "editing . . . Talent's performance hereunder." It further provides that Gastineau would not have to render any further services in connection with any such modifications and that he is entitled to approve all modified use of the performance of his services. What constitutes Talent's performance of his services "hereunder" is set forth under the "Services" Gastineau is committed to provide in the Talent Agreement and for which he was being compensated: "a sit-down interview [in Philadelphia on January 25–26, 2024] . . . and a filming session at the New York Stock Exchange" on April 13, 2024. TA at 1; *id.* ¶ 1. Accordingly, reading Paragraph 5 together with the definition of Services, it can only mean that (i) NFL Films has the right to edit Gastineau's Interview and the NYSE Shoot; (ii) Gastineau is not obligated to provide additional services in connection with NFL Films' modifications of the Interview or the NYSE Shoot; (iii) Gastineau has the right to approve any changes or modifications of the Interview and NYSE Shoot; and (iv) Gastineau is not entitled to any additional compensation in connection with any modifications whatsoever.

Read as a whole, the relevant provisions limit any approval right Gastineau had to modified uses of the performance of his services in (i) the January 25–26, 2024 Interview with Gastineau;

---

[7] There is a word missing here but in the context of this paragraph and the full Talent Agreement, as discussed immediately below, the word must be or refer to "performance."

and (ii) the April 13, 2024 NYSE Shoot. Any footage obtained of Gastineau outside of these two compensated "performances," *e.g.*, the Favre Encounter, fall outside of Gastineau's Paragraph 5 limited approval rights. In other words, Gastineau had no say in the use of the Favre Encounter both because it was not a performed service under the Talent Agreement and because he had waived any right to address or prevent its use in the Film pursuant to Paragraph 8. And Paragraph 8 confirms that Gastineau has no approval rights with respect to the totality of the Project and that Paragraph 5 merely creates a carve out for approval of modifications to his compensated services.

Gastineau's contrary and expansive reading that the approval rights granted in Paragraph 5 cover the entire Project and the contents of the Film conflicts with, and renders a nullity, Paragraph 8, pursuant to which Gastineau waived all rights of approval relating to uses of his Licensed Identity, the finished Film, and any distribution of the Film. TA ¶ 8. Gastineau's interpretation flouts the "cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other" and that "all provisions of a contract [should] be read together as a harmonious whole, if possible." *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002) (internal citations omitted).

If the parties intended to grant Gastineau any approval rights beyond the Interview and NYSE Shoot, Paragraph 8 would be unnecessary and without effect. But, as the Second Circuit instructs, the Court must "read the integrated contract as a whole to ensure that undue emphasis is not placed upon particular words and phrases, and to safeguard against adopting an interpretation that would render any individual provision superfluous." *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (internal citations omitted). *See also Sure-Trip, Inc. v. Westinghouse Eng'g*, 47 F.3d 526, 533 (2d Cir. 1995) ("[T]he intention of the parties is not derived from sentences or clauses read in isolation, but from the instrument as a whole. Not only

should the entire contract be considered, but its parts must be reconciled, if possible." (internal citations omitted)).

For **both** Paragraphs 5 **and** 8 to be given their full effect, Gastineau's unreasonable interpretation granting a wholesale veto right to NFL Films' use of the Favre Encounter footage must be rejected and the language of the Talent Agreement given its plain and proper meaning.

### B.    NFL Films Did Not Breach Paragraph 9 of the Talent Agreement

Gastineau also misreads Paragraph 9 of the Talent Agreement, which only requires Gastineau to preserve the reputation and goodwill of the NFL and does not impose obligations on NFL Films:

> Talent acknowledges the great value of the goodwill associated with the National Football League and NFL Films and the tremendous public respect and reputation for wholesomeness enjoyed by National Football League and NFL Films. Talent shall ensure that all elements of [his] Services shall be consistent with such goodwill and reputation for wholesomeness in all respects.

TA ¶ 9.

Gastineau turns the Talent Agreement on its head when he claims that Defendants breached this provision by portraying him in a manner that was inconsistent with the reputation and goodwill associated with NFL Films and affiliates, including by portraying him in a manner that was "maliciously false" and causing him to be "attacked on social media with ridicule, scorn, and contempt." FAC ¶¶ 52–58. The text confirms that Paragraph 9 obligates only Gastineau, not NFL Films, to ensure that Gastineau performs his Services in a manner that NFL Films determines is consistent with "such goodwill and reputation for wholesomeness" that the NFL and NFL Films enjoy. That contractual obligation is a one-way street—from Gastineau to NFL Films. Paragraph 9 creates no rights or obligations for NFL Films and cannot serve as a basis for Gastineau's claim that NFL Films is in breach.

Gastineau's allegations that Defendants prevented him from performing his obligations

under this provision and their interference somehow damaged him is similarly flawed. According to Gastineau's reading of Paragraph 9, the parties required Gastineau to assume the duty of (i) preventing NFL Films from using footage it elected to use, to (ii) safeguard the goodwill and reputation of the NFL and NFL Films, and that Gastineau's failure to discharge this purported duty (iii) caused *NFL Films* to breach the Talent Agreement when it published the Favre Encounter. Gastineau is wrong. There is no language in Paragraph 9 that could reasonably be read to obligate Gastineau to prevent NFL Films from doing anything to harm its own reputation. What's more, Gastineau's proposed interpretation directly contradicts Paragraph 8, under which Gastineau waived all right to inspect or approve the use of his "Licensed Identity" in connection with the Project. TA ¶ 8. *See supra,* Section I.A.

### C.    NFL Films Did Not Breach Paragraph 16 of the Talent Agreement

Gastineau also grossly misreads the merger clause when he asserts that NFL Films breached Paragraph 16 when it included the Favre Encounter in the Film because, according to Gastineau, the Favre Encounter was not part of the "subject matter" of the Project because the Talent Agreement does not specifically reference the Favre Encounter. FAC ¶¶ 64, 66.[8]

Under a plain reading of the merger clause, "subject matter" is not used to define the scope of the Project or the contents of the Film. Instead, it defines the parties' agreement with respect to Gastineau's performances and his compensation. Further, as discussed in the foregoing sections, the Talent Agreement does not require any material to be specifically included in the Film, nor does it limit the topics or subject matter of the Film. And Gastineau lacks approval rights over the manner of his identity and the finished Project. Nothing in the merger clause prevents NFL Films

---

[8] Paragraph 16 provides: "[t]his agreement sets forth the entire agreement and understanding between Talent and NFL Films as to the subject matter hereof and supersedes all prior understandings or agreements between them." FAC ¶ 63; TA ¶ 16.

from including the Favre Encounter in the Film or requires it to modify the Talent Agreement to include any Gastineau appearances that are not the subject of the Talent Agreement.

### D.    Gastineau Fails to Allege Material Breach or Damages Caused by NFL Films' Alleged Breach of Paragraph 15 of the Talent Agreement

Equally flawed is Gastineau's contention that NFL Films breached the Talent Agreement by "refusing" to provide him "a link to the Project" as set forth in Paragraph 15. FAC ¶ 59. That Paragraph states: "At Talent's request, Talent shall be provided with a link to the Project." TA ¶ 15. Assuming only for purposes of this motion that Gastineau's allegation is true, which it is not, he cannot prevail on his claim because he cannot allege as a matter of law that NFL Films' breach was material or that the breach caused him any damage. *Owens v. Gaffken & Barriger Fund, LLC*, 2009 WL 3073338, at *14 (S.D.N.Y. Sept. 21, 2009) (under New York law, material breach and damages resulting from breach are necessary elements of breach of contract claim).

"For a breach to be material, it must 'go to the root of the agreement between the parties.'" *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 2024 WL 3676931, at *15 (S.D.N.Y. Aug. 6, 2024) (Engelmayer, J.) (quoting *Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)). After initially failing to make any such allegations, Gastineau insists in his Amended Complaint that Paragraph 15 constitutes the "root of the agreement between the parties" because seeing the Film would have "permitted [him] an the [sic] opportunity to object" to Defendants' use of the Favre Encounter and "prevent the negative depicture [sic] of the Plaintiff." FAC ¶ 60.

On the contrary, the root of the Talent Agreement is to govern the terms of Gastineau's two compensated performances in the Film and the overall use of his Licensed Identity—not to provide Gastineau a link to the finished Film. Furthermore, since Gastineau had no approval rights over the Film in the first place, NFL Films' obligation to provide Gastineau a link to the Film is, at best, a courtesy. Therefore, the alleged breach is not material.

Moreover, Gastineau cannot demonstrate that NFL Films' alleged breach damaged him. "In order to recover from a defendant for breach of contract, a plaintiff must prove . . . damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). At most, Gastineau alleges that NFL Films "refused" his request to provide a link to the Film, which deprived him of the opportunity to object to his portrayal in the Film. FAC ¶¶ 59–62. But Gastineau does not, and cannot, allege that NFL Films would have been obligated to accede to such an objection. As noted, Gastineau waived any right to inspect or approve the Film or the manner of his Licensed Identity in the Film. TA ¶ 8. Accordingly, Gastineau could not have been damaged by NFL Films' alleged failure to provide a link to the Film. "Causation is an essential element of damages in a breach of contract action; and, as in tort, [Gastineau] must prove that [NFL Films'] breach *directly and proximately caused* his [] damages." *Diesel Props*, 631 F.3d at 52–53 (quoting *Nat'l Market Share v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004)). Simply put, Gastineau cannot prevail because he cannot prove that breach of Paragraph 15 directly and proximately caused any damages.

## II.    Gastineau Fails to State a Claim Under N.Y. Civ. R. L. §§ 50 and 51

Gastineau's claim against Defendants under N.Y. Civ. R. L. §§ 50 and 51 fails because he authorized the very uses of his Licensed Identity he now challenges. The claim also fails for the separate reason that the Favre Encounter constitutes a newsworthy event and is exempt from application of N.Y. Civ. R. L. §§ 50 and 51.

### A.    Gastineau Granted the Very Rights of Publicity He Seeks to Enforce

Section 50 prohibits the use of the "name, portrait, picture, likeness, or voice of any living person" for "advertising purposes [] or for the purposes of trade" "without having first obtained the written consent of such person," with Section 51 providing a civil statutory right of action against would-be violators. But here, such written consent was obtained. Gastineau clearly licensed

his right of publicity under Paragraph 2 of the Talent Agreement to the NFL Parties (which includes the NFL, NFL Films, their employees, and their agents, TA ¶ 14):

> In consideration of the Compensation, and without any further consideration from NFL Parties, Talent grants the NFL Parties (as defined below) the unlimited right throughout the world to use Talent's **name, voice, portrayal, performance, appearance, actions, likeness, and/or biographical information** ("<u>Licensed Identity</u>") **in connection with the Project, and any promotion thereof,** in any and all media whether now known or hereafter created.

TA ¶ 2 (emphasis added). Gastineau also waived any right to approve or inspect the use of his Licensed Identity in connection with the Project. *See id.* ¶ 8. Accordingly, Gastineau cannot assert a claim under N.Y. Civ. R. L. §§ 50 and 51 because he granted Defendants his rights of publicity under the Talent Agreement with respect to the entire Project.

## B.    Newsworthy Publications Are Exempt from N.Y. Civ. R. L. §§ 50 and 51

It is well-settled that N.Y. Civ. R. L. §§ 50 and 51 do not apply to "publications," such as the Film or Trailer, "concerning newsworthy events or matters of public interest." *Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85, 87 (2d Cir. 1989) (quoting *Stephano v. News Grp. Publications, Inc.*, 64 N.Y.2d 174, 224 (1984)).

The Favre Encounter comfortably sits within the newsworthiness exemption because it relates to a story of public interest concerning the "highly recognized celebrity" Gastineau, FAC ¶ 38, and his relationship with Favre concerning the all-time NFL single season sack record. *See Edme v. Internet Brands, Inc.*, 968 F. Supp. 2d 519, 528 (E.D.N.Y. 2013) ("The concept of 'newsworthiness' is applied broadly, and includes 'not only descriptions of actual events, but also articles concerning political happenings, social trends or any subject of public interest.'" (quoting *Messenger ex rel. Messenger v. Gruner + Jahr Printing & Pub.*, 94 N.Y.2d 436, 441–42 (2000))); *Oma v. Hillman Periodicals, Inc.*, 281 A.D. 240, 244 (1st Dep't 1953) (professional fighter was subject to "fair comment" where his image was "directly related to the discussion"). Specifically,

15

the Favre Encounter is a key development in the narrative of Gastineau's legacy, how he was impacted by Favre's sack, and how his New York Sack Exchange teammates viewed him. *See* Film at 44:36–45:00 (Gastineau exclaiming, Favre's sack was "not a sack"; "[Strahan] took my record away from me"); *id.* 45:31–46:04 (teammate Marty Lyons discussing the Favre Encounter: "For [Gastineau] to do that to Brett Favre, that was my last straw"). Since Gastineau is a public figure, *see* FAC ¶¶ 2, 20, 36–38, and the subject of this newsworthy narrative, "the use of his name or likeness" does not fall "within the meaning of § 51." *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 131 (2d Cir. 1984) (citing *Gautier v. Pro-Football, Inc.*, 304 N.Y. 354, 359–61 (1952)).

### C.    Gastineau Had No Expectation of Privacy in the Favre Encounter

Gastineau falsely claims that the Favre Encounter was a "private encounter," FAC ¶¶ 64–66, that he was "videotaped recorded without his consent by the Defendants," *id.* ¶ 3, and that there was no reason for Defendants' presence during the Favre Encounter.

The Favre Encounter footage, as it appears in both the Film and the Trailer, confirms that (i) the Favre Encounter occurred in an area that was filled with onlookers, Film at 45:00–45:32, and (ii) Gastineau consented to the recording because he is wearing a microphone provided by the film crew to capture the conversation. The audio makes clear Gastineau is wearing a microphone when he taps his chest while addressing Favre. *Id.* at 45:21. The film crew was not hiding behind a curtain to capture this moment without Gastineau's knowledge. To the contrary, the Film confirms that Gastineau was fully aware of and cooperated in creating this footage.[9]

### III.    Gastineau Fails to State a Lanham Act or Common Law Unfair Competition Claim

Gastineau's Lanham Act and common law claims for unfair competition must be dismissed because he fails to state a cognizable claim due to his grant of his Licensed Identity in connection

---

[9] This is consistent with Gastineau's execution of the General Release in August 2023, before the Favre Encounter.

with the Film and any promotion of it. Moreover, the First Amendment immunizes Defendants from Gastineau's Lanham Act and unfair competition claims.

### A.    Gastineau's Lanham Act Claim Fails Because He Licensed His Right of Publicity to Defendants and Cannot Allege Consumer Confusion

To state a claim for unfair competition or false designation of origin under the Lanham Act, Gastineau must allege: "(1) [he] owns a valid mark entitled to protection under the Lanham Act; (2) [Defendants] used the protected mark in commerce, without [his] consent; and (3) [Defendants'] use of that mark is likely to cause consumers confusion as to the origin or sponsorship of [Defendants'] goods." *Camelot SI, LLC v. ThreeSixty Brands Grp. LLC*, 632 F. Supp. 3d 471, 480 (S.D.N.Y. 2022) (quoting *Lopez v. Nike, Inc.*, 2021 WL 128574, at *4 (S.D.N.Y. Jan. 14, 2021)).

Assuming, *arguendo*, that Gastineau has protectible interests in his "valuable name, picture, image, or likeness" as alleged, FAC ¶ 73, Gastineau nonetheless fails to state a claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as a matter of law because he cannot establish that (i) Defendants used any such assets without his consent or (ii) their uses were likely to cause confusion.

First, Gastineau consented, ***in writing***, to the uses about which he is complaining. Gastineau granted the NFL Parties the "use [of his] name, voice, portrayal, performance, appearance, actions, likeness, and/or biographical information ('Licensed Identity') in connection with the Project, and any promotion thereof." TA ¶ 2. Gastineau cannot now plausibly allege he never authorized NFL Films to use his Licensed Identity in connection with the Encounter. FAC ¶ 73. For the same reason, Gastineau also cannot maintain that publication of the Favre Encounter "falsely . . . implies that [he] sponsors, endorses, or is affiliated with Defendants' goods and services," as he alleges. *Id.* ¶ 74.

Second, even if Gastineau had not explicitly granted his consent, he still fails to allege how

17

consumers could be confused as to the origin or Gastineau's sponsorship of the Film. Gastineau only alleges that the "use of [his] name, picture, image, and likeness falsely of the [Favre] encounter . . . implies that Plaintiff sponsors, endorses or is affiliated with Defendants' goods and services and is likely to cause consumer confusion." FAC ¶ 74. Gastineau does not allege *how* his portrayal in the Favre Encounter would elicit any confusion in consumers, while his numerous other appearances throughout the Film—which he does not challenge—would not cause confusion. Gastineau's Lanham Act claim accordingly fails. *See Dryer v. Nat'l Football League*, 814 F.3d 938, 944–45 (8th Cir. 2016) (no Lanham Act claim where former NFL players failed to identify any statements in NFL films that might mislead viewers as to their relationships with the NFL).

### B.    Gastineau's Unfair Competition Claim Fails for the Same Reasons

"The 'elements of an unfair competition claim under New York law are identical to the elements of an unfair competition claim under the Lanham Act, save that the plaintiff must also show bad faith by the infringing party.'" *Camelot*, 632 F. Supp. 3d at 480 (quoting *Fischer v. Forrest*, 286 F. Supp. 3d 590, 617 (S.D.N.Y. 2018), *aff'd*, 968 F.3d 216 (2d Cir. 2020)). Since Gastineau fails to state a claim for unfair competition under the Lanham Act, his common law claim for unfair competition must also fail.

Gastineau also cannot succeed on a showing of bad faith based on Defendants' publication of the Favre Encounter as a matter of law. "Bad faith concerns whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any likely confusion between the two companies' products." *Diesel S.p.A. v. Diesel Power Gear, LLC*, 2022 WL 956223, at *12 (S.D.N.Y. Mar. 30, 2022). But the terms of the Talent Agreement expressly authorize Defendants to use Gastineau's Licensed Identity "in connection with the Project, and any promotion thereof." *See* TA ¶ 2. Defendants clearly did not and could not exhibit the bad faith Gastineau alleges when they were merely exercising their rights under the Talent Agreement.

Gastineau's additions to the Amended Complaint continue to miss the mark. Gastineau suggests that by omitting the handshake from the depiction of the Favre Encounter, viewers are left with the impression that there is "animosity or hatred" between Gastineau and Favre. FAC ¶¶ 97–99. But such an impression does not imply a sponsorship by Gastineau of the Film or the NFL (if anything, it might imply Gastineau does *not* endorse the Film), it does not demonstrate that Defendants acted in bad faith, nor does it make the Film false in any material way. The omission of the handshake simply does not establish any element necessary to a claim for unfair competition.

### C.    The First Amendment Exempts Defendants from the Lanham Act Claim

Under the *Rogers* test, the First Amendment protects Defendants from Gastineau's Lanham Act claims. The *Rogers* test exempts "artistic works," such as the Film and Trailer, from Lanham Act claims "as long as the defendant's use of the mark or other identifying material [*e.g.,* name, image or likeness] is (1) 'artistically relevant' to the work and (2) not 'explicitly misleading' as to the source of content of the work." *Brown*, 394 F. Supp. 3d at 442 (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989)) (applying *Rogers* test to biographical documentary). *See also Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) (recognizing books, newspapers, magazines, and motion pictures are protected by the First Amendment). Defendants' uses of Gastineau's name, likeness, and image meet both prongs of the *Rogers* test.

First, there is no doubt that Gastineau—and his image and likeness—are artistically relevant to the Film. The *Rogers* threshold for artistic relevance is "purposely low" and is satisfied "unless the use 'has *no* artistic relevance to the underlying work *whatsoever.*'" *Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*, 868 F. Supp. 2d 172, 178 (S.D.N.Y. 2012) (quoting *Rogers,* 875 F.2d at 999). "Here, the [Film] is a biographical documentary charting [the New York Sack Exchange members' careers], and [Gastineau's] appearance in the film is artistically relevant in depicting that story." *Brown*, 394 F. Supp. 3d at 442.

19

Second, neither the Film nor the Trailer are "explicitly misleading as the source or content of the [F]ilm." *Id*. at 442. "The relevant question is whether the defendant's use of the [identifying material] 'is misleading in the sense that it induces members of the public to believe [the work] was prepared or otherwise authorized' by the plaintiff." *Id.* at 443 (quoting *Louis Vuitton*, 868 F. Supp. 2d at 179). This requires a finding of likelihood of confusion, though that finding "must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers*." *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993).

There is simply no merit to Gastineau's allegation that Defendants' use of his "name, picture, image, and likeness falsely of the [Favre Encounter] . . . ***implies*** that [Gastineau] sponsors, endorses, or is affiliated with Defendants' goods and services and is likely to cause consumer confusion." FAC ¶ 74 (emphasis added). That fails to allege that Defendants' use of Gastineau's name and image are "explicitly misleading," as required. *Brown*, 394 F. Supp. 3d at 442. In fact, Gastineau's allegations suggest the Film's use of the Favre Encounter is more akin to a criticism of Gastineau's conduct. Even ignoring the existence of the Talent Agreement—as Gastineau does—this further undermines any suggestion that Gastineau sponsored or endorsed Defendants' uses of his identity in connection with the Favre Encounter. *See Lamparello v. Falwell*, 420 F.3d 309, 315 (4th Cir. 2005) ("No one would believe that Reverend Falwell sponsored a site criticizing himself, his positions, and his interpretations of the Bible.").

## IV.    The Copyright Act Preempts Gastineau's Publicity and Unfair Competition Claims

"[T]he Copyright Act preempts state law claims asserting rights equivalent to those protected within the general scope of the statute." *Urbont v. Sony Music Ent.*, 831 F.3d 80, 93 (2d Cir. 2016) (citing 17 U.S.C. § 301(a)). As Gastineau's publicity and common law unfair competition claims both fall within the scope of the Copyright Act and challenge the exercise of exclusive rights granted to copyright owners under it, these claims should be dismissed as

20

preempted.

In determining whether the Copyright Act preempts state law claims, courts in this Circuit apply a two-part test. The first prong of this test examines whether the "claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works" under Sections 102 and 103 of the Copyright Act. *Melendez v. Sirius XM Radio, In*c., 50 F.4th 294, 301–02 (2d Cir. 2022) (quoting *Briarpatch Ltd. L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004)). The second prong asks whether "the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." *Id.*

Gastineau's right of publicity and unfair competition claims meet both prongs of this test. First, there is no doubt that Gastineau's claims apply to works of authorship—the Film and Trailer—that fall within the subject matter of the Copyright Act as "motion pictures and other audiovisual works." 17 U.S.C. § 102(a)(6). Gastineau's claims are "based on [Defendants'] use of the copyrightable works themselves." *Melendez*, 50 F.4th at 303–04 (right of publicity claim falls within subject matter of Copyright Act). *See, e.g.,* FAC ¶¶ 8, 15, 97, 102, (alleging Defendants published or failed to publish footage of the Favre Encounter); *id.* ¶¶ 80–84 (alleging Defendants made use of Gastineau's "picture [and] image" in footage). Second, Gastineau's claims challenge acts that infringe on rights equivalent to the exclusive rights enumerated under the Copyright Act, including the exclusive rights of reproduction, distribution, and display, 17 U.S.C. § 106(1), (3), (4), and should be dismissed as preempted. *See Melendez*, 50 F.4th at 308 (right of publicity claim "aimed at stopping the reproduction of copyrightable works that embody [plaintiff's] identity"); *Betty, Inc. v. PepsiCo, Inc.*, 283 F. Supp. 3d 154, 164 (S.D.N.Y. 2017) (unfair competition claim stemmed from distribution and reproduction of work); *Dryer*, 814 F.3d at 944 (right of publicity

claims by former NFL players over use of their game performances and post-retirement interviews preempted by Copyright Act).

## V.    All Claims Must Be Dismissed Against Weiner and Rodgers

Even if the Court sustains any claims against the corporate Defendants—which it should not—Gastineau's claims against Weiner and Rodgers must be dismissed for three independent reasons: (i) failure to effectuate valid service of process; (ii) lack of personal jurisdiction; and (iii) failure to make allegations specific to them as Fed. R. Civ. P. 8 requires.

### A.    Gastineau Failed to Timely Serve Weiner and Rodgers

"If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). Having filed the initial complaint on March 11, 2025, Gastineau violated the Rule, serving Weiner and Rodgers 93 and 94 days later on June 12, 2025 and June 13, 2025, respectively. ECF 24, 25.

Though the Court may extend the time for service for good cause, "[a]ttorney neglect and inadvertence 'are generally not sufficient to support a finding of good cause.'" *George v. Pro. Disposables Int'l, Inc.*, 221 F. Supp. 3d 428, 443 (S.D.N.Y. 2016) (quoting *Songhorian v. Lee*, 2012 WL 6043283, at *3 (S.D.N.Y. Dec. 3, 2012)). Such is plainly the case here, particularly because Defendants pointed out Gastineau's failure to serve Weiner and Rodgers in their motion to dismiss, which they filed before the 90-day deadline. *See* ECF 16 (filed May 23, 2025). Accordingly, where it is "undisputed that [Gastineau] did not serve the Complaint on [D]efendants Weiner and Rodgers] by [the 90-day deadline]," dismissal under Fed. R. Civ. P. 12(b)(5) is proper. *See Kogan v. Facebook, Inc.*, 334 F.R.D. 393, 398 (S.D.N.Y. 2020) (Engelmayer, J.) (dismissing complaint for failure to effect timely service). Moreover, Gastineau made no request for an extension or showing of good cause. He simply failed to meet the deadline.

**B.**    **Gastineau Fails to Allege Facts Supporting Personal Jurisdiction**

"Under New York law, for a plaintiff to demonstrate personal jurisdiction over a defendant, the plaintiff must show either that the defendant was present and doing business in New York within the meaning of C.P.L.R. § 301, known as general jurisdiction, or that the defendant committed acts within the scope of New York's long-arm statute, C.P.L.R. § 302, known as specific jurisdiction." *Shorts v. Cedars Bus. Servs., LLC*, 2025 WL 580208, at *5 (S.D.N.Y. Feb. 21, 2025) (quoting *Stroud v. Tyson Foods, Inc.*, 91 F. Supp. 3d 381, 385 (E.D.N.Y. 2015)). *See also Reed v. Luxury Vacation Home LLC*, 632 F. Supp. 3d 489, 509 (S.D.N.Y. 2022) (a district court sitting in diversity looks to the law of the state in which it sits to determine personal jurisdiction). Gastineau has done neither here.

**1.**    **Gastineau Fails to Allege Facts Supporting General Jurisdiction**

Despite amending his complaint, Gastineau makes no case for general jurisdiction over Weiner and Rodgers under C.P.L.R. § 301, either by alleging facts regarding their citizenship or about whether they have engaged in a "continuous and systematic course of doing business in New York as [] individual[s]." *Waheed v. Sands*, 2024 WL 1719363, at *3 (S.D.N.Y. Apr. 22, 2024).

First, Gastineau does not allege any facts suggesting Weiner and Rodgers are residents of New York. *See* FAC ¶¶ 26–27. Nor could he—they are domiciled in New Jersey, where Gastineau served them. *See* ECF 24, 25. Because Gastineau does not allege Weiner and Rodgers are domiciled in New York, the exercise of general jurisdiction is improper here. *Kaplan Grp. Invs.*, 694 F. Supp. 3d at 384. Second, Gastineau utterly neglects to allege how Weiner and Rodgers could be subject to general jurisdiction doing business in New York as ***individuals***. *Wallace Church & Co. Inc. v. Wyattzier, LLC*, 2020 WL 4369850, at *5 (S.D.N.Y. July 30, 2020) ("[A]n individual defendant 'cannot be subject to jurisdiction under C.P.L.R. § 301 unless he is doing business in New York as an individual rather than on behalf of a corporation.'" (quoting

*Brinkmann v. Adrian Carriers, Inc.*, 29 A.D.3d 615, 617 (2d Dep't 2006))). To the contrary, Gastineau alleges Weiner and Rodgers are "***employee[s] of the other Defendants***" who "directed, produced, and published the [Film.]'" FAC ¶¶ 28–29 (emphasis added). This patently undermines any suggestion that Weiner and Rodgers conducted business in New York on an individual basis.

### 2.    Gastineau Fails to Allege Facts Supporting Specific Jurisdiction

Gastineau has articulated no factual basis that would allow the Court to exercise specific personal jurisdiction over Weiner and Rodgers under New York's long-arm statute, C.P.L.R. § 302. Even assuming Gastineau had any such intentions, he makes no effort to allege facts that would invoke any applicable parts of the statute, whether by suggesting either of Weiner and Rodgers "transacts any business within the state or contracts anywhere to supply goods or services in the state" or "commits a tortious act within the state." *Kaplan Grp. Invs.*, 694 F. Supp. 3d at 384. (citing bases for specific jurisdiction over a non-domiciliary under C.P.L.R. § 302(a)).

Gastineau makes no allegation that Weiner and Rodgers transacted any business within New York as individuals. Nor does he identify any allegedly tortious act they committed in an individual capacity, let alone "a single act that [Weiner or Rodgers] took in New York." *Id.* at 385. To the contrary, the Amended Complaint alleges the Favre Encounter occurred in Chicago. FAC ¶ 3. Gastineau does not, and cannot, allege that Weiner and Rodgers were parties to the Talent Agreement, either. *Id.* ¶ 33; TA at 1, 4. Thus, Gastineau has not identified any basis for personal jurisdiction under C.P.L.R. § 302. Even if such a basis could be inferred from elsewhere in the Amended Complaint, specific jurisdiction can only be exercised over claims "aris[ing] out of or relat[ing] to the defendant's conduct in the forum state." *Cartiga, LLC v. Aquino*, 2025 WL 388804, at *4 (S.D.N.Y. Feb. 4, 2025) (Engelmayer, J.) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 133 n.10 (2014)). No such connection can be inferred here because no such conduct occurred.

### C.    The Amended Complaint Lacks Any Specific Allegations Against Weiner and Rodgers.

Gastineau's claims against Weiner and Rodgers also fail for the separate reason that he does not make ***any specific or distinguishing allegations against them***. This flatly violates Fed. R. Civ. P. 8, which, at minimum, requires that "a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *SCE Grp.*, 2020 WL 1033592, at *3 (quoting *Atuahene*, 10 F. App'x at 34 (summary order)) (dismissing claims where allegations failed to specifically refer to any individual defendant).

Throughout the Amended Complaint, Gastineau does not direct any allegations towards Weiner and Rodgers or describe anything either of them did whatsoever. Instead, Gastineau attributes all the alleged conduct to an amorphous group of "Defendants." *See* FAC ¶¶ 3, 8–17, 19, 31–33, 35, 41–42, 50–63, 69, 71–78; 80–89; 91, 93–105; 107; 109–110. In some instances, Gastineau's indiscriminate pleadings lead to inaccurate representations about Weiner and Rodgers. For example, Gastineau describes all the Defendants, including Weiner and Rodgers, as entities "registered with the New York Department of State . . . to do business in New York." FAC ¶ 32. Gastineau also incorrectly asserts that Weiner and Rodgers are parties to the Talent Agreement, *id.* ¶¶ 42, 107, when the only counterparty to the Talent Agreement is NFL Films, TA at 1, 4.

These scatter-shot allegations are deficient under Rule 8, which requires that Gastineau give "fair notice" of what his claims are and the grounds upon which they rest. *SCE Grp.*, 2020 WL 1033592, at *3. "By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [Gastineau's] complaint fail[s] to satisfy this minimum standard." *Id*. *See also Medina v. Bauer*, 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004).

### <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Amended Complaint with prejudice.

Dated: July 3, 2025                    Respectfully submitted,

                                       /s/ Alexander Kaplan
                                       Alexander Kaplan
                                       Jennifer Pariser
                                       Timothy Chung
                                       OPPENHEIM + ZEBRAK, LLP
                                       461 5th Avenue, 19th Floor
                                       New York, NY 10017
                                       Telephone: (212) 951-1156
                                       alex@oandzlaw.com
                                       jpariser@oandzlaw.com
                                       tchung@oandzlaw.com

                                       *Attorneys for Defendants*

## <u>CIV. L. R. 7.1(C) CERTIFICATE OF COMPLIANCE</u>

I, Alexander Kaplan, counsel for Defendants in this matter, hereby certify that according to the word count function in Microsoft Word, the Memorandum of Law this certificate is appended to consists of 8594 words, including footnotes and excluding the elements enumerated in Civ. L. R. 7.1(c).

*/s/ Alexander Kaplan*

Alexander Kaplan