UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK GASTINEAU,

                                        Plaintiff,                                    25 Civ. 2041 (PAE)

                    -v-                                                            OPINION & ORDER

ESPN INC., ESPN FILMS, NFL PRODUCTIONS, LLC,
*d/b/a* NFL FILMS, NATIONAL FOOTBALL LEAGUE,
JAMES WEINER, *and* KEN RODGERS,

                                        Defendants.

---

PAUL A. ENGELMAYER, District Judge:

        This case arises from a documentary film about the New York Jets' 1980s defensive line,

colloquially known as "The New York Sack Exchange."  Plaintiff Mark Gastineau, a defensive

end who collaborated in the film's production, sues its producers and publishers.  He faults them

for including in it footage of his angry interaction with Brett Favre, the former National Football

League ("NFL") quarterback, at a Chicago convention, in which Gastineau accused Favre of

submitting to a sack that cost Gastineau the NFL's single-season sack record.  Gastineau brings

common law claims of breach of contract and unfair competition, and statutory claims based on

the Lanham Act and New York Civil Rights Law.  He seeks damages and injunctive relief.

        The defendants—ESPN Inc., ESPN Films, NFL Productions LLC, the NFL, James

Weiner, and Ken Rodgers—now move to dismiss, principally for failure to state a claim, under

Federal Rule of Civil Procedure 12(b)(6).  For the following reasons, the Court grants the

motion.

I.      **Factual Background**[1]

A.      **The Parties**

Gastineau is a former defensive end who played for the New York Jets between 1979 and 1988.  *See* Dkt. 30 ("AC") ¶ 20.  When he retired, he held the NFL record—then 22—for most sacks in a season, a record he achieved in 1984.[2]  *Id.*  He is a citizen of New Jersey.  *Id.*

ESPN Inc. is a multinational sports-media conglomerate.  *Id.* ¶ 25.  ESPN Films is a U.S. production company that produces and distributes sports films and documentaries.  *Id.* ¶ 26. The NFL is a 32-team U.S. football league whose headquarters are located in this District.  *Id.* ¶ 24.  NFL Productions, LLC ("NFL Productions") produces commercials, television programs, films, and documentaries about the NFL.  *Id.* ¶ 22.  James Weiner and Ken Rodgers are employed by the other defendants and produced the film at issue, which is entitled "30 for 30: The New York Sack Exchange."  *Id.* ¶¶ 28–29.

B.      **The November 18, 2023 Encounter Between Gastineau and Favre**

Favre primarily played for the Green Bay Packers.  *Id.* ¶ 4.  Gastineau alleges that, in the final minutes of the 2001 season, Favre "gave up a sack" to Michael Strahan, the defensive end with the New York Giants, giving Strahan 22.5 sacks for the season, eclipsing Gastineau's 1984 record.  *See id.* ¶¶ 5–6.

---

[1] The Court draws the facts in this decision from the Amended Complaint ("AC") and the materials incorporated by reference in it.  Dkt. 30; *see DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  In resolving defendants' motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the AC as true and draws all reasonable inferences in Gastineau's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[2] For the football-illiterate: a sack occurs when a defensive player tackles the opposing team's quarterback behind the line of scrimmage before the quarterback can throw a forward pass.

On November 18, 2023, Gastineau and Favre had a tense encounter at the Chicago Sports Spectacular (the "convention"). *Id.* ¶ 5. Gastineau was followed by a film crew and wore a microphone. *See* Dkt. 18-4 ("Film") at 45:01–45:31.[3] Gastineau and Favre initially shook hands, which is not depicted in the film, but Gastineau was "visibl[y] upset and emotional with Favre." AC ¶ 7. As captured in the film, they then had the following 30-second verbal exchange:

| | |
|---|---|
| Gastineau: | Excuse me. [We] finally met [*sic*]. |
| Favre: | I thought we met a long time ago. I wish I saw you. |
| Gastineau: | Yeah, right . . . when you fell down for him [Strahan]. I'm gonna get my sack back. I'm gonna get my sack back, dude. |
| Favre: | You probably would hurt me. |
| Gastineau: | Well, I don't care. You hurt me. You hurt me. You hear me? You really hurt me. You hurt me, Brett. |

---

[3] The Court draws parts of this account from the film itself. A complaint is deemed to include any materials "incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (*per curiam*)). Even where a record is not incorporated by reference, "the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the [record] 'integral' to the complaint." *Id.* at 153 (quoting *Int'l Audiotext*, 62 F.3d at 72). The AC did not attach an electronic copy of the film. Defendants attached it to their motion, Dkt. 18-4, with an affidavit attesting to its authenticity, Dkt. 18, which Gastineau did not dispute. Because the AC incorporates by reference and relies heavily on the film itself, the Court considers the film for purposes of this motion. *See, e.g.*, *Chambers*, 282 F.3d at 152–55; *Brown v. Showtime Networks, Inc.*, 394 F. Supp. 3d 418, 436 (S.D.N.Y. 2019) (considering, on motion to dismiss, documentary film because it "is integral to the Complaint").

Defendants also attached to their motion a "Guest / Performer Release" for the film. Dkt. 18-2 (the "release"). It is dated August 5, 2023 and bears Gastineau's signature. *Id.* at 3. On its face, it appears to grant the NFL and related entities the right to use Gastineau's name and likeness in connection with, and waived any right to approve, the film. *Id.* at 2. Defendants did not ask the Court to consider the release in resolving this motion. Because the AC does not reference or rely on the release, the Court has not considered it here. *See Chambers*, 282 F.3d at 152–55.

Film at 45:01–45:31.  Favre, who is seen edging backwards with apparent trepidation, was then ushered away.  *Id.*

### C.    The Talent Agreement Between Gastineau and NFL Productions

Two months later, on January 25, 2024, Gastineau entered into a "talent agreement" with NFL Productions.  *See* AC ¶ 9; Dkt. 18-3 ("Talent Agreement") at 1.[4]  Salient provisions are:

***Gastineau's services***:  Gastineau "will render non-exclusive on-camera appearance services" for the film, to be "titled '30 for 30: The New York Sack Exchange' (the 'Project')."  Talent Agreement at 1.  His services "shall include a sit-down interview (the 'Interview') and a filming session at the New York Stock Exchange (the 'NYSE Shoot')."  *Id.*  The Interview and the NYSE Shoot were to occur in Philadelphia and New York, respectively; they were together to last between five and eight hours; and Gastineau was to be paid $10,000 for these services and "the rights granted herein."  *Id.*

***The rights of other parties***:  Under Section 2, Gastineau granted to "the NFL Parties"

> the unlimited right throughout the world to use [Gastineau's] name, voice, portrayal, performance, appearance, action, likeness, and/or biographical information ('Licensed Identity') in connection with the Project, and any promotion thereof, in any and all media whether now known or hereafter created.

---

[4] The AC extensively references and relies on, but did not attach, the talent agreement. Defendants attached the agreement to their motion, with a declaration attesting to its authenticity, which Gastineau does not dispute.  Because the AC cites the talent agreement as an ostensible basis for defendants' liability and asks the Court to construe it, the Court considers it for purposes of this motion.  *See, e.g.*, *Chambers*, 282 F.3d at 152–55 & n.4 (proper to consider, on motion to dismiss, contracts defendant submitted where complaint included "references to the contracts and request[ed] judicial interpretation of their terms"); *Ackerman v. Loc. Union 363, Int'l Bhd. of Elec. Workers*, 423 F. Supp. 2d 125, 127 (S.D.N.Y. 2006) ("The classic examples of documents that may be considered on a motion to dismiss even though the plaintiff does not physically attach them to the complaint are the contracts that underlie the claims in suit—such as, in this action, where plaintiff affirmatively pleads the existence and terms of a[n] agreement, the agreement itself."); *Wright v. TD Bank, N.A.*, No. 24 Civ. 2356, 2025 WL 89544, at *2 (S.D.N.Y. Jan. 14, 2025) (same), *aff'd*, 2026 WL 377125 (2d Cir. Feb. 11, 2026).

*Id.* The agreement defines the "NFL Parties" as "NFL Films, the National Football League, its professional football member clubs[], NFL Ventures, L.P., its subsidiaries and affiliates, and each of their respective subsidiaries, affiliates, officers, directors, agents and employees." *Id.* at 3. Under Section 4,

> NFL Films and its representatives and designees shall have the unlimited right throughout the world to use, reuse, publish, republish, broadcast, exhibit and otherwise distribute all or any portion of the Project (inclusive of [Gastineau's] performance hereunder) in any and all media . . . in perpetuity without additional compensation.

*Id.* at 2. Under Section 5, NFL Films

> shall have the right to make or have made any number of modifications to the Project by editing, modifying, varying, dubbing, adding to, subtracting from and integrating any or all of [Gastineau's] performance hereunder, provided that [Gastineau] will not have to render any services in connection with the production of such modifications and all modified use of the [*sic*] must be approved by [Gastineau]. For the avoidance of doubt, NFL Films shall have no obligation to pay [Gastineau] for modifications to the Project (or to [Gastineau's] performance therein).

*Id.* And under Section 6, NFL Films

> shall own all copyrights and other rights in and to the Project and any videotape, photography, and recording and other materials created that depicts or represents [Gastineau], whether or not used in connection with the Project. [Gastineau] shall not have any right to copy or use, or have or claim to have, either under this Agreement or otherwise, any right, title or interest of any kind or nature in and to the Project or the advertising ideas, announcements, phrases, titles, music, words, or trademarks belonging to the NFL Parties or used in the Project, and the same shall remain the exclusive property of the NFL Parties.

> ***Gastineau's waiver of rights and acknowledgments***: Section 8 provides that:

> [Gastineau] waives any right that [he] may have to inspect or approve the duration or manner of [Gastineau's] Licensed Identity in the Project, the finished Project and any distribution of the Project.

*Id.* In Section 9, Gastineau further

> acknowledge[d] the great value of the goodwill associated with the National Football League and NFL Films and the tremendous public respect and reputation

for wholesomeness enjoyed by National Football League and NFL Films. [Gastineau] shall ensure that all elements of his Services shall be consistent with such goodwill and reputation for wholesomeness in all respects.

*Id.* (cleaned up).

**Link to project**:  Section 15 states that, at Gastineau's request, he "shall be provided with a link to the Project." *Id.* at 4.

**Merger clause, and choice of law and jurisdiction**:  In Section 16, the parties agreed that the agreement constituted their entire agreement "as to the subject matter hereof and supersedes all prior understandings or agreements between them." *Id.*  It provided that the agreement would be governed by New York law, and that federal and state courts in New York would have jurisdiction over any controversy relating to the agreement.  *Id.*

### D.     Publication of "30 for 30: The New York Sack Exchange"

On December 13, 2024, ESPN aired the film.  It chronicled the Jets' dominant defensive line of the early 1980s, comprised of Gastineau, Joe Klecko, Marty Lyons, and Abdul Salaam.  It included excerpts of the two appearances described in the talent agreement: Gastineau's solo sit-down interview, and his group interview (with Klecko, Lyons, and Salaam) at the New York Stock Exchange.  *See, e.g.*, Film at 7:51–9:45, 35:32–37:18, 46:00–49:15.

Toward the end of the 53-minute program, the documentary addressed Strahan's topping Gastineau's single-season sack record.  It played the sack of Favre that gave Strahan the record. *Id.* at 44:10–44:35.  It played an excerpt of Gastineau's solo interview, in which he said the sack should have been disallowed:

> I didn't know what had happened.  The NFL should have stopped that, and said, "Listen, no, no, no, no, no, that's not a sack."  He [Strahan] took my record away from me.  Anybody will tell you that Brett Favre took a dive.  And you know it, she knows it, he knows it, and everybody knows.

*Id.* at 44:35–44:59.  It played a clip of Gastineau's encounter with Favre at the 2023 convention, as recounted above.  *Id.* at 45:01–45:31.  It then played a clip from an interview in which Lyons, Gastineau's former Jets teammate, said of that encounter:  "For [Gastineau] to do that to Brett Favre, that was my last straw.  I tried to defend him [Gastineau].  I'm done defending him."  *Id.* at 45:31–45:42.

## II.    This Lawsuit

### A.    Gastineau's Claims Arising from the Film

On March 11, 2025, Gastineau brought this lawsuit, Dkts. 1, 5, and on July 1, 2025, filed the AC, the operative complaint today, Dkt. 30.

The AC alleges that Gastineau did not authorize defendants, in the film, to use his name or likeness from his "private encounter" with Favre on November 18, 2023.  *Id.* ¶ 41.  It alleges that Gastineau had not approved including footage of that encounter, and that, in including it, defendants breached § 5 of the Talent Agreement.  *Id.* ¶ 51.  It alleges that defendants "falsely and misleadingly" omitted from the film a handshake between Gastineau and Favre at the outset of the encounter, and their "apologies," which would have indicated the lack of animosity between the two.  *Id.* ¶ 97.  It alleges that, based on the film's depiction of the encounter, Gastineau "has been attacked on social media with ridicule, scorn and contempt."  *Id.* ¶ 53.

Based on these events, the AC brings four claims: (1) unfair competition, under the Lanham Act § 43(a), *id.* ¶¶ 70–78; (2) unauthorized use of his name and likeness for advertising, under the New York Civil Rights Law ("NYCRL") §§ 50 and 51, *id.* ¶¶ 79–89; (3) common law unfair competition, *id.* ¶¶ 90–105; and (4) breach of contract, *id.* ¶¶ 106–110.

### B.    Relevant Procedural History

On July 3, 2025, defendants filed the instant motion to dismiss the AC, supported by a memorandum of law, declaration, and exhibits.  Dkts. 31–32.[5]  On August 11, 2026, Gastineau opposed.  Dkt. 36 ("Opp'n").  On September 11, 2025, defendants replied.  Dkt. 37.  The Court has stayed discovery pending resolution of the motion to dismiss.  Dkt. 41.

## III.    Applicable Legal Standards Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  In resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff."  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  That tenet, however, does not apply to legal conclusions.  *See Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

## IV.    Discussion

Defendants move to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6).  The Court considers the claims in turn.

---

[5] On May 23, 2025, defendants had moved to dismiss the original Complaint.  Dkt. 16.  On May 27, 2025, the Court directed Gastineau to amend his complaint or oppose the motion to dismiss, Dkt. 19, prompting Gastineau's filing of the AC.

### A.    Breach of Contract

To state a claim for breach of contract under New York law, a complaint must plausibly allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).

On a motion to dismiss, a district court may dismiss a contract-breach claim "only if the terms of the contract are unambiguous." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) ("*Orchard Hill*"). Where the unambiguous language "contradicts or fails to support the plaintiff's allegations of breach," a claim is to be dismissed. *Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co.*, 530 F. Supp. 3d 447, 454 (S.D.N.Y. 2021) (citation omitted). Whether a contract is ambiguous "is a question of law to be resolved by the courts." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (citation omitted). A contract is unambiguous if its language has "a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion," but ambiguous "if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Orchard Hill*, 830 F.3d at 157–58 (quoting *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.*, 773 F.3d 110, 114 (2d Cir. 2014)). "[P]rovisions in a contract are not ambiguous merely because the parties interpret them differently." *Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 88 N.Y.2d 347, 352 (1996).

At the threshold, Gastineau's claim cannot proceed against the defendants other than NFL Productions, because it, alone among them, was a party to the Talent Agreement. *See*

Talent Agreement at 1.  Non-parties generally cannot be held liable for breach of contract, *Underdog Trucking, LLC v. Verizon Servs. Corp.*, No. 9 Civ. 8918, 2010 WL 2900048, at *3 (S.D.N.Y. July 20, 2010), and a plaintiff who seeks to pierce the corporate veil of a contracting party must plead supporting facts, *see Haymount Urgent Care PC v. GoFund Advance, LLC*, 690 F. Supp. 3d 167, 188 n.8 (S.D.N.Y. 2023); *EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 512 (S.D.N.Y. 2005).  The AC does not do so here.  It does not allege that any other defendant is a member of NFL Productions, nor facts that warrant piercing NFL Production's corporate veil.  And Gastineau's opposition brief does not claim a basis to pierce the corporate veil.  The Court thus dismisses the contract-breach claims against the other defendants.[6]

As to NFL Productions, it is undisputed on this motion that the Talent Agreement was a binding contract and that Gastineau adequately performed.  The disputed issues are whether it is plausibly pled that NFL Productions breached and the breach caused Gastineau damages.  The AC alleges breaches of four provisions.

*Section 5*:  The AC alleges that § 5 required NFL Productions to give Gastineau an opportunity to approve or reject any "modifications" to the film, and that it breached by including the clip of the encounter with Favre without Gastineau's approval.  AC ¶¶ 50–51.  NFL Productions counters that § 5 did not give Gastineau broad-ranging approval rights with respect to the film, but only a limited right to approve modifications of the footage of the two interviews in which the agreement obliged him to participate: the solo sit-down and the group interview at the New York Stock Exchange.  It argues that the Agreement expressly disclaimed

---

[6] The contract-breach claims against these defendants would independently fail for the reasons, recited below, that the claim against NFL Productions fails.

any right on Gastineau's part to approve or reject modifications to other parts of the film, such as its portrayal of Gastineau's encounter with Favre.

NFL Productions is correct. Section 5 unambiguously did not grant Gastineau any right to veto NFL Production's inclusion of the Favre encounter in the film. It provided that *NFL Productions* "shall have the right" to modify the "Project"—which the agreement defined as the entire film—by "editing, modifying, varying, dubbing, adding to, subtracting from and integrating any or all of [Gastineau's] performance hereunder, provided that [Gastineau] will not have to render any services in connection with the production of such modifications and all modified use of the [*sic*] must be approved by [Gastineau]." Talent Agreement at 2. The parties' debate focuses on the final clause, the drafting of which self-evidently is flawed. A word is missing, in that the clause reads: "all modified use of the [missing word] must be approved by [Gastineau]." *Id.*

Gastineau argues that the parties must have intended the missing word to be "Project," such that Gastineau had approval rights over the entire film. But inserting that word would conflict with § 8 of the Agreement. That provision stated: "[Gastineau] waives any right that [he] may have to inspect or approve the duration or manner of [Gastineau's] Licensed Identity in the Project, the finished Project and any distribution of the Project." *Id.* It unequivocally provided that Gastineau did *not* have approval rights over the film writ large. Gastineau's proposal to treat the missing word in § 5 as "Project"—giving him editorial control over the entire film—would "render [§ 8] meaningless." *Sure-Trip, Inc. v. Westinghouse Eng'g*, 47 F.3d 526, 533 (2d Cir. 1995). Because "the entire contract [must] be considered" and "its parts must be reconciled, if possible," the only reasonable interpretation of § 5 is that the missing word was intended to refer to something less. *Id.* And the words immediately preceding that clause

11

reveal what that was: Gastineau's "performance hereunder" the Agreement, which consisted of the two interviews in which the Agreement obliged him to participate.

Under that reading, which NFL Productions urges, § 5 granted Gastineau approval rights as to any modifications to the footage of those two interviews—*i.e.*, the "performance" covered by the Agreement. That reading would deny Gastineau editorial rights with respect to footage of his encounter with Favre, which predated the Agreement and to which the Agreement nowhere refers. That construction is also far the more sensible than Gastineau's in that the footage of the Favre encounter was not conceptually any different from any other preexisting footage that the film's producers might have weighed including—whether footage of Gastineau, other members of the Sack Exchange, NFL games, or other events in the world. Gastineau's reading would have improbably given him sovereignty over the film's treatment of such footage. Notably, other than NFL Production's sensible construction and Gastineau's implausible one, no party has identified any alternative way to construe the elision in § 5.

This reading accords with fundamental tenets of contract construction. When interpreting a contract, a court's "primary objective . . . is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000) (citation omitted). "[T]he words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (citation omitted). Where parties dispute the meaning of a particular contract clause, the task of the court "is to determine whether such clauses are ambiguous when 'read in the context of the entire agreement.'" *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d

Cir. 1993) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990)); *see also Sure-Trip, Inc.*, 47 F.3d at 533 ("[T]he intention of the parties [to a contract] is not derived from sentences or clauses read in isolation, but from the instrument as a whole.").  Construing the elision in § 5 in light of the balance of that provision and § 8, § 5 of the Agreement did not grant Gastineau rights to approve the film's depiction of his encounter with Favre.

The AC thus does not plausibly plead that NFL Productions breached § 5 by including footage of the Favre encounter in the film.  *See, e.g.*, *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162–63 (1990) (even where contract provision, standing alone, was arguably ambiguous, no ambiguity existed when such was "read in the context of the entire agreement"); *Brad H. v. City of New York*, 17 N.Y.3d 180, 186–88 (2011) (same); *L. Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 468–72 (2d Cir. 2010) (same); *Eitan Ventures, LLC v. Peeled, Inc.*, 943 N.Y.S.2d 449, 451 (1st Dep't 2012) (same).

***Section 9***:  The AC next alleges that NFL Productions violated § 9.  That provision states that Gastineau (1) "acknowledged the great value of the goodwill associated with" the NFL and "the tremendous public respect and reputation for wholesomeness enjoyed by" it, and (2) "shall ensure that all elements of his Services shall be consistent with such goodwill and reputation for wholesomeness in all respects."  Talent Agreement at 2 (cleaned up).  In claiming breach, the AC alleges that the film "was inconsistent with" the NFL's "reputation for wholesomeness," AC ¶ 56, and that NFL Productions thereby prevented Gastineau from "ensur[ing] that all elements of [his appearances]" were consistent with that reputation, *id.* ¶ 58.  That claim of breach is unsustainable.  Section 9 imposes obligations on *Gastineau* to conduct his appearances consistent with those reputational standards.  It does not impose obligations on NFL Productions. To the extent that the AC can be read to allege that the film inhibited Gastineau's efforts to

comply with his obligations, that issue would arise only if *Gastineau* were accused of breaching § 9—which NFL Productions has not claimed. The AC thus does not plausibly allege a breach of § 9 by NFL Productions.

*Section 16*: The AC next claims a breach of § 16, the merger provision. It states that the Agreement reflected "the entire agreement and understanding between [Gastineau] and NFL Films as to the subject matter hereof and supersedes all prior understandings or agreements between them." Talent Agreement at 4. The AC alleges that, because the Agreement did not refer to the Favre encounter, that encounter could not have been part of the Project, and thus defendants breached § 16 by including it in the film. That argument is baseless. Neither § 16 nor any other provision of the Agreement limited the film's content.

*Section 15*: The AC claims a breach of § 15, which provided: "At [Gastineau's] request, [Gastineau] shall be provided with a link to the Project." *Id.* The AC alleges that, before the film's release, Gastineau requested a link to view it, but defendants "refused this request," and that this refusal denied Gastineau his contractual right "to object" to the film's depiction of his encounter with Favre. AC ¶¶ 59–62.

This claim fails for two reasons. First, the AC does not allege that Gastineau was altogether denied a link to the film, but only that he requested but was denied a link prior to the film's release. *See id.* Section 15 does not, however, entitle Gastineau to a pre-release link. And implicit in the AC, which centrally alleges Gastineau's discontent with the content of the film insofar as it included a clip of the Favre encounter, is that Gastineau later was able to access the film. *See, e.g.*, *id.* ¶¶ 3, 7–8, 49, 51, 64, 73. Second, as the AC formulates this breach claim, Gastineau's sole basis for claiming injury is that the absence of a pre-release link disabled him from exercising his ostensible contractual right to editorial control. On this basis, the AC claims

14

$25 million in damages. *Id.* at 28. But as reviewed above, Gastineau did not have any such right, except with respect to modifications of his two interview appearances, which the AC does not allege occurred. The damages the AC alleges thus are not plausibly alleged to have been caused by the breach it claims. *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52–53 (2d Cir. 2011) ("Causation is an essential element of damages in a breach of contract action" (citation omitted)).

### B.    New York Civil Rights Law §§ 50 & 51

The AC also claims that the defendants misappropriated Gastineau's name and likeness, in violation of NYCRL §§ 50 and 51. These claims are based on the film's depiction of Gastineau's encounter with Favre and on advertising for the film.

Section 50, titled "right of privacy," provides that a "person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait, picture, likeness, or voice of any living person without having first obtained the written consent of such person . . . is guilty of a misdemeanor." Section 51 authorizes private lawsuits for damages and injunctive relief for such violations, including punitive damages for violations committed "knowingly."

Gastineau's claim fails for two independent reasons.

First, in the Talent Agreement, Gastineau consented in writing to defendants' commercial use of his name and likeness in connection with the film. As noted, § 2 granted defendants

> the unlimited right throughout the world to use [Gastineau's] name, voice, portrayal, performance, appearance, actions, likeness, and/or biographical information ("Licensed Identity") in connection with the Project [*i.e.*, the film], and any promotion thereof, in any and all media whether now known or hereafter created.

Talent Agreement at 1. This expansive text covers defendants' use of Gastineau's name and likeness for trade and advertising purposes. *See Finger v. Omni Public'ns Int'l, Ltd.*, 77

15

N.Y.2d 138, 141 (1990) (§§ 50 and 51 "strictly limited to *nonconsensual* commercial appropriations" (emphasis added)) (citing *Arrington v. N.Y. Times Co.*, 55 N.Y.2d 433, 439 (1982)). And the language of § 2 did not limit this authorization to the two interviews Gastineau was obligated to participate in under the Agreement. It extends to the use of Gastineau's identity "in connection with the Project"—*i.e.*, the entire film. That included footage of Gastineau's encounter with Favre. Gastineau's express written authorization to use his name and likeness in the film and related promotion blocks his NYCRL claims. *See, e.g.*, *Bendit v. Canva, Inc.*, No. 23 Civ. 473, 2023 WL 5391413, at *8–9 (S.D.N.Y. Aug. 22, 2023) (no misappropriation where written release covered subject matter); *Passelaigue v. Getty Images (US), Inc.*, No. 16 Civ. 1362, 2018 WL 1156011, at *3, 5–7 (S.D.N.Y. Mar. 1, 2018) (same).

Second, even if this were not the case, defendants' use of the footage of the Favre encounter falls within the "newsworthiness" exception to §§ 50 and 51. That exception reflects that the First Amendment limits the permissible reach of these statutes, *Burck v. Mars, Inc.*, 571 F. Supp. 2d 446, 451 (S.D.N.Y. 2008), which do not apply to "reports of newsworthy events or matters of public interest," even if the reports generate profits, *Messenger v. Gruner + Jahr Printing & Publ'g*, 94 N.Y.2d 436, 441 (2000). The newsworthiness exception is "liberally applied," such that misappropriation claims can prevail "only in those instances where there is 'no real relationship' between [plaintiff's name or likeness] and an article[,] or where the article is an 'advertisement in disguise.'" *Finger*, 77 N.Y.2d at 143 (quoting *Murray v. N.Y. Magazine Co.*, 27 N.Y.2d 406, 409 (1971)).

Gastineau's public confrontation of Favre, although seemingly puerile, clears this low bar. It is newsworthy in that the participants were nationally recognized football stars (Favre is a member of the Pro Football Hall of Fame), the exchange between them concerned a venerated

NFL record, the incident featured prominently in the film, and, as the film reflects, Gastineau's aggressive conduct appears to have driven a wedge within the Sack Exchange quartet that was the subject of the film.  *See, e.g.*, Film at 45:30 (reaction of former teammate Lyons: "For [Gastineau] to do that to Brett Favre, that was my last straw").

The AC thus does not state a misappropriation claim under §§ 50 and 51.  *See, e.g.*, *Arrington*, 55 N.Y.2d at 440–44 (newsworthiness exception blocked misappropriation claim where pedestrian's photograph bore "real relationship" to magazine article); *Messenger*, 94 N.Y.2d at 444–45 (same concerning child's photograph used in connection with newsworthy magazine column); *Porco v. Lifetime Ent. Servs., LLC*, 150 N.Y.S.3d 380, 385–86 (3d Dep't 2021) (same where partly fictionalized "docudrama" depicted names and likenesses of convicted murderer and surviving victim).

### C.    The Lanham Act and Common Law Unfair Competition

The AC also claims unfair competition, both under the Lanham Act and New York common law.

Section 43(a) of the Lanham Act protects registered marks against the use of any word, term, name, symbol, device, or any combination of such "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a).  To prevail on an unfair competition claim under this provision, a plaintiff must show that (1) he has a valid mark entitled to protection, (2) which the defendant used in commerce without plaintiff's consent, and (3) the defendant's actions are likely to cause confusion as to the origin or sponsorship of the defendant's goods or services.  *See 1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 407–08 (2d Cir. 2005);

*see also Fischer v. Forrest*, 286 F. Supp. 3d 590, 612 (S.D.N.Y. 2018), *aff'd*, 968 F.3d 216 (2d Cir. 2020). For unfair competition under New York common law, the elements are the same, save that plaintiff must also show bad faith by the infringing party. *See Fischer*, 286 F. Supp. 3d at 617.

The Lanham Act and common law unfair competition claims fail, for at least two reasons.[7]

First, as noted, the Talent Agreement reflects that Gastineau consented, in writing, to the use of his name and likeness in the film and related promotional materials. That authorization was broad and encompassed Gastineau's name and likeness as reflected in extrinsic footage, such as that of the encounter with Favre. Thus, even assuming that Gastineau's name and likeness constitute a valid mark, defendants used these in the film with Gastineau's consent. *See, e.g.*, *Omega S.A. v. Omega Eng'g, Inc.*, 396 F. Supp. 2d 166, 174 (D. Conn. 2005) (plaintiff's consent to defendant's use of its marks barred Lanham Act claims), *opinion adhered to on reconsideration*, No. 01 Civ. 2104, 2005 WL 3307277 (D. Conn. Dec. 6, 2005); *In re Houbigant Inc.*, 914 F. Supp. 964, 990 (S.D.N.Y. 1995) (similar); *Ballet Makers, Inc. v. U.S. Shoe Corp.*, 633 F. Supp. 1328, 1335 (S.D.N.Y. 1986) (similar).

Second, the AC does not adequately plead that the film's depiction of Gastineau's encounter with Favre is likely to cause consumer confusion. The AC does not coherently explain how the incident is apt to cause cognizable confusion. The inclusion of the brief footage of the Favre encounter does not bear on whether a viewer would associate Gastineau with the film. To the extent a viewer would do so, it would be based on Gastineau's consensual participation in the

---

[7] Because the AC does not plausibly plead the elements of these claims, the Court does not have occasion to address defendants' separate argument for dismissal based on the First Amendment.

two interviews that are centerpieces of the film.  The AC's theory of confusion appears to be that the footage of the Favre encounter would lead a viewer to conclude that Gastineau harbored hard feelings towards Favre, whereas in fact, he claims, his attitude was conciliatory.  AC ¶ 98.  But any confusion on that point would not qualify as consumer confusion.  *See, e.g.*, *OffWhite Prods., LLC v. Off-White LLC*, 480 F. Supp. 3d 558, 564–65 (S.D.N.Y. 2020) ("Trademark law is not concerned with mere theoretical possibilities of confusion, deception, or mistake or with *de minimis* situations but with the practicalities of the commercial world." (quoting *Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.*, 954 F.2d 713, 717 (Fed. Cir. 1992)); *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 635 (S.D.N.Y. 2008) (dismissing claim where implausible that defendant's use of mark "would confuse ordinarily prudent consumers as to sponsorship or affiliation" (cleaned up)); *Eliya, Inc. v. Steven Madden, Ltd.*, 749 F. App'x 43, 47–48 (2d Cir. 2018) (summary order) (affirming dismissal for similar reasons).

The AC's common law unfair competition claim fails for an additional reason.  It has an extra element, requiring a plaintiff to show bad faith.  *See Fischer*, 286 F. Supp. 3d at 617.  No facts are pled that plausibly support inferring bad faith.  On the contrary, the Talent Agreement gave NFL Productions "the unlimited right throughout the world to use [Gastineau's] name, voice, portrayal, performance, appearance, actions, likeness, and/or biographical information [] in connection with" the film.  Talent Agreement at 1.  Defendants exercised that authority in including the clip of Gastineau and Favre in the film.  Without more, a party "does not act in bad faith when it exercises its legal and contractual rights."  *Bernstein v. Cengage Learning, Inc.*, No. 19 Civ. 7541, 2020 WL 5819862, at *5 (S.D.N.Y. Sept. 29, 2020) (citation omitted).

The AC therefore does not state plausible unfair competition claims under either the Lanham Act or New York common law.

19

## CONCLUSION

For the above reasons, the Court grants defendants' motion to dismiss the AC, in its entirety, for failure to state a claim under Rule 12(b)(6).[8]  The dismissal is with prejudice.[9]  The Clerk of Court is respectfully directed to terminate all pending motions and close this case.


SO ORDERED.

*Paul A. Engelmayer*
PAUL A. ENGELMAYER
United States District Judge


Dated: March 16, 2026
       New York, New York

---

[8] Weiner and Rodgers also moved to dismiss all claims against them on additional grounds, to wit: that the AC does not adequately allege personal jurisdiction with respect to them, under Rule 12(b)(2); that service of process was untimely, under Rule 12(b)(5); and that the AC does not provide fair notice of allegations against them, under Rule 8.  In light of the dismissal under Rule 12(b)(6), the Court has not had occasion to reach these arguments.

[9] Gastineau has already had, and taken, the opportunity to amend his original complaint in response to defendants' motion to dismiss.  He does not seek leave to file a Second Amended Complaint and his opposition brief does not disclose allegations that would permit such to state a viable claim.  For Gastineau, this lawsuit thus will not yield an additional "SAC."  *See, e.g.*, *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 467 (S.D.N.Y.) (dismissing complaint with prejudice where plaintiffs had already amended and further amendment would be futile), *aff'd*, 838 F. App'x 582 (2d Cir. 2020) (summary order).